Good afternoon, your honors. Dennis Feardon for Appellant Harkonen, and I too will attempt to watch the clock and preserve a few minutes for rebuttal. The key event in this case occurred 15 years ago. The court heard a direct appeal in 2013. I submit that the importance of the case and the importance of the time of resolution of the case is as important today, and no less important today than it has been at any time in those 15 years. And the reason is that the Harkonen conviction remains within the scientific community a subject of much discussion about the issue of whether it imposes a real limit on scientific speech. Just as in any drug trial, the most important variable is mortality as one of the elements in this discussion, I would submit that in any criminal case, this court is going to be very interested in the question of whether the defendant in fact committed a crime. And I'm going to begin there, because I submit that in the wake of the Matrix case, in the wake of the 2012 passage by Congress of the Food and Drug Administration Safety Improvement Act of 2012, in the wake of the consensus statement of the American Statistical Society in 2016, Dr. Harkonen could not be charged today, much less convicted. He could not be charged today, because the biostatistical theory on which he was convicted has been completely refuted by the Supreme Court, by Congress itself, and by the relevant scientific community, that is statisticians and biostatisticians. There's no question here that the raw data of this test trial showed that 40% of the subjects who took this drug survived a 40% greater rate of survival among all the participants, and 70% greater rate of survival among the mid to mild to moderate group, or 77% of the total in the test. The New England Journal of Medicine, when it analyzed this in 2004, said there's only one false statement that can be made about these test results, and that false statement would be that it did not demonstrate a certain level of survival benefit. I mean, given that relevant scientific community, the opinions stated in this press release were reasonable. They were scientifically reasonable. And because that's true, under the McNulty rule, they could not be found false or fraudulent, to the reasonable expression of scientific opinion. In 2009, the government gave the conviction by stating to the jury that if you don't have a statistically significant result of .05 or lower on the primary endpoint of a test, you may not draw any conclusion, no conclusion. Any conclusion that you draw is false in this statement. That is the argument upon which they want a conviction. Let me ask you something about that. That struck me as critical, and usually when you look for a correlation between two variables, it means nothing without statistical significance. However, sometimes it does. Now, you said you got your case basically out of the government's expert, and that often happens. What did the government expert do to explain what statistical significance means to the jury? How did he explain it? Well, the government's principal witness, Thomas Fleming, said just that. If you don't get a statistically significant result to the .05 or less on your primary endpoint, anything else that you say, any conclusion about evidence? No, that's not what I'm asking. Most jurors don't know what it means. Anybody who's studied any statistics at all doesn't. One way to explain it is by the comparison. It's an alternate hypothesis for your complicity. Another way is coin flip. Flip a coin, it comes up heads. Done means it's a dirty coin. Flip it twice, hits both times. Well, there's one chance in four that it would. That's not significant. The third time, one chance in eight, it would come up heads all three times. Still not significant. Fourth flip, one chance in 16, still doesn't suggest anything funny about the coin. One chance in 32, what was that, the fifth flip or fourth flip? I can't remember anymore. That's less than one chance in 20. It's happening by chance. So it's a p-value better than 0.05, lower than 0.05. That's statistically significant. That's how the first explanation is made. Did the expert explain to the jury what he meant by not statistically significant or statistically significant? He explained what he said because he wasn't contradicted by any defense expert. What he said is that, as the judge could tell me or discuss this testimony, 0.05 is a matching value. 0.05, did he say what it meant? Did he talk about coin flips or anything else? Well, because he explained to the jury, it means less than one chance in 20 of it happening just by random events. I guess the rest of the testimony is that anything that doesn't have a 0.05 value, and in this case it was on lung capacity, means that anything else that you say about trial results is unreliable. So in this case, you have indisputably. I'm curious, did you put your fellow, Dr. Raghu, on the stand? No, he was a government witness. He was a government witness. And, Your Honor, when the FDA or the government comes after a fair bit of people, it tends to have an effect. Dr. Raghu was a author of the 2004 New England Journal of Medicine analysis, which said that the only false statement that you could make about this test was that it did not have a mortality benefit. But what did he say on the stand? Well, let me also add, he, in the press release, said that these results were compelling. That's why I asked the question. He said, gee whiz, I guess I really didn't have a full sense of what was going on in the case, and what we've demonstrated in our reply brief is that Dr. Raghu made affirmative statements not only in the press release but for years later. It was only when the government chose to indict people in this case that he clearly became a prosecution witness. But I submit this, Your Honor. If you turn to the government in this case and say you got a conviction by saying that if the primary end point doesn't produce a value of .05 or later, no conclusions are permissible, are you willing to tell it sounds to me like you're just repeating that phrase? Well, you have not told me what any witness explained to me. I'm sorry about what .05 means. But the point is the half of 1% or five hundredths of 1% of what? Well, the point here also is that, in fact, you looked at mortality benefit as opposed to the lung capacity. Among the moderate group, the P value was .004. It was amazingly compelling. But the government's position is, no, you can't look at mortality because it's not the primary end point. So their position was that any conclusion such as the .004 serenation mortality benefit among this group was necessarily false and misleading, but they can't maintain that today because the United States  medical regulators and professionals make judgments about causations based on factors other than P values and statistical analysis. And it is simply untrue that statistical analysis is the be-all and end-all of inference about causation. So you think it says that, in fact, Dr. Herndon only presented statistical evidence in the press release? Well, that's not the point. Your Honor, specifically one of the things that Matrix says is that a factor other than simple human analysis are consistent among studies. And the press release specifically says that one of the reasons to be optimistic and notice the fact that Herndon, in the press release, said it may demonstrate that it indicates an advance in the life of patients and specifically they relied on the prior study done in Switzerland. This was the second study, and the release says this, that showed a positive mortality benefit among IPF patients. So it is not true that he relied only on that. And, Your Honor, I would submit that this press release said our study demonstrates that 40% more people who take our medicine survive than the entire population. Our study demonstrates that 70% more in this group survive. Then that's just the raw data. You don't need p-values to make the statement. When you're dealing with a failed disease, as the statement in the press release says, there is an ethical obligation to the greatest of the public that more, a great deal, more people survived who took this drug than did not. So, Your Honor, I would submit that it isn't simply a reliance on p-values and prior statistics. It's a reliance on the raw data of survivors in this case. Before we leave and take your time and just want to save some time for rebuttal, why did our candidate wait five months to file the red card? Let's see. Well, as Judge Seaborn said, and it's page ER11, he accepted the reasons why it took five months, which were, and quite frankly, not only was this an enormous record, but you're talking about a decision, admittedly, to challenge the decisions of someone, as Judge Seaborn said, who has been in this community and has a reputation in this community, and it required not only an examination of all of the different trial teams' files, but it required a face-to-face interview with the team to get their statements about what happened. So, Judge Seaborn did not find any failing in the five months that it took to file the red. He found a failing in the failure to raise an IAC claim prior to sentencing. I wondered about that. So, if I, once you were in sentencing, you had been glorious, and once your fellow was sentenced, he had some limitations on his liberty. Why couldn't he file an habeas suit? At that point, I had to say my verdict was teased by ineffective assistance, and therefore I should err in my favor. I can answer that question because I've dealt with this in another case. The rules of this court say that once a judgment is submitted, you are barred from raising a 2255 until such time as the direct appeal has been exhausted. So, he was legally barred from raising it because of that. Why couldn't he raise a direct appeal, an ineffective assistance counsel claim? For two reasons, Your Honor. One, under the law of this court, IAC claims are strongly, strongly discouraged on direct appeal. But furthermore, you cannot, on direct appeal, make reference to any information that was not placed before the jury. And as this court said in 2013. Oh, before the district court. That was not. Well, certainly before the jury in this case is what we're talking about. But the evidence. No, before the district court. Well, certainly on direct appeal, before the district court and the ineffective assistance might have been raised as early as the second suit case. But, but, but Your Honor, what about the trial phase? Well, an e-trial motion was brought by the trial attorneys. Once they did that, it was over in terms of the ability to raise another e-trial motion. You only get one shot at that. And they couldn't raise it because they were the trial attorneys. But Your Honor, I will point out to you that this court, on direct appeal, said the most convincing evidence in support of Dr. Harkin's claim was not presented to the jury. And therefore, we will not consider it. Which is why we are here on a collateral attack. Because the court said it wasn't before the trial jury. Your Honor, I had a lot of trouble with your ineffective assistance claim. Not on the prejudice issue. I didn't get to that. But on the question of whether they have competently represented the defendant when they didn't put out an answer. And the problem I had is when they talk to their experts the night before they're going to put them on, their witnesses won't step up. Your Honor, on what basis could you say that? Because if you look at the declarations of Dr. Seabright, Dr. May, and Ron Mitchell, they directly contradict that that is what occurred. And so how can you example? If I were to look at it, I'd obviously miss something. Tell me where to look. Well, what happens? The answers are really big. Give me a reference so I can look at it. I will provide you with specific ER references when I get out and sit down. But the point is this, Your Honor, that everything said about that interview with Dr. Mayer by Mr. Topel and his lawyers was contradicted by Dr. Mayer's description of what went on in this at a minimum. If the court below or this court were to rely on the declarations of the trial team, who obviously have an axe to grind in this, it had to do so only after hearing the disputed testimony of the witnesses who took that issue. And so the court below refused to hold an evidentiary hearing, even though these declarations are in extreme tension with one another. And so we submit that, at a minimum, if the court were to go off and say, I have a problem with your IOC, given what the defense lawyers have to say, it would require a remand where those declarations are contested by the declarations that were put in evidence. I just want to read them. Yeah. Everybody's had the experience if they try cases of just before they put their witness on, the witness goes silent on them, so you tell the witness, well, we're getting them after all. And that's basically what the government says happens. I'll sit down, Your Honor. What happened in this case was, and I believe it is, Attorney Topel said we've got the case waiting. We're not going to put on experts. I believe that. That's very consistent with Mark Topel. However, when they lost the case, he came before the court and said, you have to acquit because they didn't have any expert testimony. They didn't put any in. So, therefore, they lose because there was no expert testimony of it. The judge then tells him, don't be silly. I let all of that expert testimony in. So, the contemporary record. Well, a lawyer has a perfect right to be inconsistent in the arguments he makes on different occasions, unless there's a judicial slope on the problem, which there isn't here. I don't understand why that matters. Well, it matters in this case. You stand up in court and tell Judge Goodtell, I'm going to call this witness tomorrow. After you fail to call them, you write a motion that says, A, well, they didn't have any expert testimony, which is nonsense, and, B, here's all of the kind of expert testimony, citing articles that we could have presented. And she said, I'm not paying any attention to that. You didn't put proof of the jury. It's only years later, when the decision is challenged on a 2255, that we get the explanation that, oh, no, our witness went south, which is directly contradicted by the testimony of Dr. Reiner. One final point on this. This makes a big difference. In most cases, as a trial lawyer, as you know, Judge Teinfeld, you're deciding, if I put this witness on, maybe they'll go south and I'll weaken my case. But under the law of McNulty, the very admission of Dr. Reiner's testimony, as a prestigious biostatistician, means that you didn't have to beat the other side. Once he was in, Judge Goodtell or this court on appeal would have had to grant a medical, because under the McNulty rule, his testimony about the efficacy and statements you can make about a drug trial was peaceful. And if I can remember, was he the guy who was going to say, I wouldn't prescribe it because it kills too many people? There was some doctor who said that in that case. Well, if he showed up, the other witness they didn't call at trial, Dr. Seabright from the Harvard Medical School, was going to testify. I knew about the results of this. So I continued to prescribe Act-Immune, and it continued to help my patients. They didn't put him on either. And the notion that he couldn't be called, and I'm getting into the weeds perhaps, because he could be rebutted by a study taken five years later is nonsense, because Judge Goodtell said no study five years later is relevant to the truth or falsity or good faith of the statements that were made in 2002. I realize that. Thank you very much. Good afternoon, Your Honors. My name is Mary Jean Chan, and I represent the United States in this appeal. The district court correctly concluded that the defendant was not eligible and did not qualify for the extraordinary revenue of Corm Novus for two reasons. First, as this court now alluded to, he didn't meet the second of four prongs or criteria factors under Hirabayashi. He could have filed, but he failed to earlier file the claims that he raised in his petition. And secondly, because he doesn't meet the fourth factor, which is that he doesn't raise an error or there's no error of a fundamental nature that gains his conviction. I'm starting with just the timeliness, what I'll call the timeliness factor. This court's decision in Riedel was decided extensively by Judge Seaborg in his order denying the petition for Corm Novus. Barry, I think, explicitly governs this case. The defendant was somebody who was very well-resourced. Not only is he educated, but he's well-resourced. A trial he had not only Sylvia Austin, attorney who's working for him, but also an entire team of attorneys, at least five from the Kasputz firm. And then he had somebody to kind of overlook and give him a second opinion and all of that, and that was Ronald Winchell. He had all these people, and then after his conviction, he fired the Kasputz team, and then he had Mark Dodd and the Sylvia Austin team helping him. And then after that, he hired Alan Levin to sue Marcus Tickell in state court for provisional negligence, somebody who is very well-resourced. And he failed at any of these times. The multiple decision points were times when he could have declined. When did he sue Tickell for negligence? Let me find out. Your Honor, he sued Mr. Tickell on August 3, 2011. So he had been sentenced in April of 2011, and prior to that, on August 26, 2010, he had terminated Tickell. And this was, you know, just to give you context, too, the direct appeal in this case was resolved in May 2013, two years later, from the time when he sued Tickell in civil court. So was he foreclosed for bringing his innocence until May 2013? I don't believe that he is. I'm not familiar with what Mr. Reardon was saying about the peace law that forecloses him. I think that he could have brought it any time, and I think this Court is familiar, too, that many times ineffective assistance of claims, counsel claims, are brought before the direct appeal and are actually adjudicated on direct appeal of the record as the district court does. Rarely adjudicated on direct appeal. Rarely. The problem with taking them on direct appeal is you want to hear what the lawyer has to say, but if I may say it, because of his duty to his client, rarely on direct appeal.  But Tickell, in this case, was in an unusual situation because he was actually terminated years before the sentencing, not years, maybe a year before the sentencing. It's another reason why we don't entertain usually on direct appeal because maybe the guy who went on appeal and we'll never have to entertain him.  But, again, the search warrant petition was denied in December, and he didn't finish his probation sentence until four months after that. And, by the way, the reason it terminated only four months after that was because he specifically made a strategic call not to stay his sentence. And at the time of sentencing, Judge Patel said, well, should we just stay your sentence? I'm giving you three years probation, as opposed to the ten years requested by the government of custodial time.  He said, no, I have got probation. I want it to run. So, by the time that he was, we're talking about April, that's why he ran. But, still, he had four months between the time of the search warrant denial and the time of the end of his custodial sentence. He could have raised that. We would expect that of prisoners who are actually in custody, who are not well-resourced, who are not well-educated. We expect them to file their 2255 motions in a timely manner. So, there's really no excuse for the defendant, in this case, not doing so, and then say, well, now I need to have this extraordinary remedy of quorum novis, which has only been really used a handful of times, I think, in this court, because it's such grave injustice. I think that that simply isn't right, and that is why the court was corrected saying that, based upon a specific factor of two, he doesn't meet the requirements for quorum novis. But that, yes. Attorney negligence. I'm an attorney who operated this claim. Yes. I just can't imagine a jury who would understand what anyone was talking about with .05p, less than .05, if they didn't have somebody explain to them what was said then. Did anyone explain it to them? Yes, Your Honor. So, just to begin with, Mr. DuPont, in his closing argument, he said, I said I was going to present some experts. Actually, I got my expert testimony through the government's experts. So he said the government's experts said what? The experts said that when you have a p-value of 0.05, that means there's 5% chance that the result that you got, that would be as extreme as you got, was due to chance, as opposed to some sort of causation. Well, wait a minute. It has nothing to do with causation. It has to do with correlation. If a correlation is striking enough, then you look for a causation. But correlations, well, the way the statisticians like to explain it is that wet streets don't cause rain, even though they correlate 100%. The p-value is 0. Any day where you see wet streets, there was rain.  Correlation and causation are two different things. Well, I point you, Your Honor, to the testimony, and I know that this is a huge record that we've given to you to look at and review, but if you look at S.E.R. 407-53, that's the government's experts' records, you'll see Dr. Fleming's testimony. And you can also consult with the section of the experts that refer to Dr. Kramer's testimony as well. And what he, what Dr. Fleming said was, this is a little bit like a marksman if you have a Secret Service person, and you say, well, let's try. Well, I know for some reason, it's just kind of a pastime of mine to read medical research just for fun. Okay. And I know that, as was claimed in this case, that there is increasing questioning of the requirement of statistical significance and the correlation before you look seriously at the drug. And the reason is that the drug may work very well on some people and not work at all on other people. And if you have a big sample or a very small sample, you may find that you have a correlation that is not statistically significant because you have to find the subgroup that the drug works to a statistically significant extent on. And that's the reason for the question. Did anyone testify about that? Actually, a number of people testified that exactly what actually the matrix says and what the defendants' experts, who have been interviewed reportedly, sort of testified to, which is that it's good science to do post hoc analysis and to try to find the subgroups and do that afterwards. But in the context of the Phase 3 trial, which is what the press release was reporting on, it has a very specific context. Interim units self-specified that the cutoff was P equals 0.05, and that's at Exhibit 281 at page 16. That within that context, when you have the evidence of the defendant going through and meeting, it's not only 0.05 or 0.06, 0.07, it's 0.52. It means it's more likely that this is just random than not, that when you report that and you put out a press release that's aimed at patients and caregivers as well as doctors, and you say that the headline is P equals 0.034, that's not the headline, however, that's sort of the first paragraph of the press release. After cutting through the data and finding something that really is not what the study was powered for, it wasn't designed to study this. I mean, just as background, IPF is a disease where from the time that they often discover something that's not what they're looking for, like that stuff for baldness, that men use to have a, you know, give it to women because it causes searsomeness, it was supposed to be a heart drug, and it just accidentally turned out to be good for baldness. And none of the witnesses that the government put on said that it was bad science to say let's look for something, or that we shouldn't continue to go on and look at it. And they eventually approved of the 007 trial, which was sort of devastating, because they thought that there was enough of a lead, it was the corrector would be a threat. There's some data there to suggest that maybe there is a mortality benefit, but it's not a statistically significant point, and that's really the key thing. All of the witnesses that they wanted to put on will say, and if you look carefully at their diversions, they say that there's some clinical significance, even if there isn't statistical significance. What they practically said is that it is statistically significant. They don't say that the primary endpoint was not met, that the p-value there was 0.52. What they say is the p-value is .004, or a point that was not specified in any of the analyses when Interim was designing this study. Well, it says that they found a statistically significant benefit in patients with mild to moderate disease, and I thought that turned out to be true. Is this not what they were looking for? No, Your Honor. So the testimony at trial was that when you talk about statistical significance, that has this very specific meaning. We test that you can come up with a p-value of something that meets the cutoff, but that doesn't mean it's statistically significant unless it's really sort of powered and directed at what the study is engineered for. That may be necessary to get the FDA to approve use of the drug on-label rather than off-label for that particular illness, but it doesn't mean that it's not statistically significant for the particular finding, even though it's not what the study was looking for and the study had not reached its end point. But that's not what the testimony at trial was, Your Honor. This trial was 21 months. It was not each year. A lot of studies don't meet their end point either because it's unethical because the drug is killing too many people or because it's unethical because it's obvious the drug is helping too many people. The life expectancy for somebody, and this was also 3 to 5 years upon diagnosis of IPF, this study was only 21 months. So the reason mortality was not something that was a primary end point or even really one of the top secondary end points was because they simply didn't think they'd have enough deaths to really make a statistical significance issue. We had 330 patients in the study as a whole, so 162 of them were on Actibute. Of those who died, we only have the total number of people who died was less than 40. So to try to argue that there was statistical significance from a trial where, and I believe that Bruce Lee says that this is a large trial, really misleads the reader as to exactly what the study was, what the point of the study was, and what the statistics means. And that, I think, again, if you go and look at the testimony by Dr. Fleming, Dr. Craver, who are experts, as well as Dr. Walton and some of the other doctors. How did Dr. Bracco explain away what he's quoted as saying in the press release? The mortality benefit is very compelling and represents the major breakthrough in this difficult disease. I believe he testified that he was told what the results of the study were by the defendant. So he didn't actually have hands on or eyes on the actual data. And when the defendant said, this is exciting. It's a very positive trial. We've done it. He said, that's great. It's very compelling. And so then it was that quote that they then used in the press release. And he also testified that he hadn't even realized that the quote really was going for or was for the purpose of the press release. He was surprised when Dr. Fleming. It says here that he was the phase three study's lead principal investigator. So presumably he would know the study inside and out. Is that true? Was he the phase three study's lead principal investigator? He was, but there was an issue with confining the data. So it was a timing issue. He was not one of the first people who had access to the data. When the data was first opened up, it was very humid. It was Dr. Craver, really, who was the first one who got access to the data. And his first reaction was, oh, we've completely, and not failed this in kind of a general sense that this is of no use, but we've completely failed what we tried to set out to prove, which is that this drug will increase the progression-free survival time of IPF patients. But look, there's some positive news. We can continue to study this drug. It's not all bad. It's just inconclusive. And that's what all the testimony from that trial was. And that is really all the testimony that their witnesses said. And Mr. Mayer or Dr. Mayer was really only willing to say also that it's clinically significant, not statistically significant. I'd also quickly like to just move to the prejudice from also Strickland, which I think was also not met here, and for the reasons I just said. If you look at the testimony of Dr. Mayer, he specifically says in his declaration, he told the attorneys, I'm not willing to say that this is statistically significant. And he also says, yes, I don't remember specifically, but I could have told the attorneys the night before I was supposed to testify that this prejudice could be somewhat misleading. And he might want to cabinet that, but it's a reasonable judgment of an attorney to say that if I'm paying somebody $1,059 to offer an opinion, and he can't even say that it's accurate, and he thinks that it might be misleading to some people, including the government's witnesses. That is not testimony that's going to help. So I refer you to Mr. Duke Hall's declaration again, which is really concurred by attorneys Ager, Moorman, and Goodman. And I would ask you to find that there was no ineffective assistance in this case. This case is simply not a case that imperils free speech or scientific inquiry. It's a straightforward application of the Wire 5 statute. And we'd ask you to affirm. All right. Thank you. Thank you. If you could ask for some citations. The defense declarations, the petitioner's declarations for feuding, all of the declarations of the Tocqueville team are found at IRER 93-127. Those are the declarations of Attorney Haddon, Attorney Winchell, Dr. Mayer, and Dr. Zebrack. And I very much recommend them to your attention. Counsel made a false statement, and I'm sure it was an oversight. She said that the press release did not state that it missed the primary endpoint. That's untrue if you look at it. It says that it missed the primary endpoint at least twice. She said, oh, the problem really is, because they have to back off the argument they made to the jury and say, yeah, you can rely on other factors now after matrix and so forth. But the discussion of the data was misleading and false. Specifically, and they say in their brief for the first time, the statement in the press release that the P value for the relevant group was .004. You can read the government's closing argument from beginning to end. You will never find an argument there that that statement in the press release was false. And the reason you won't find that argument is that one of the government's chief witnesses in this case, Dr. Grader, stated that he computed that press .004, and it was correct and not wrong. He stated that you'll find it at SER 2008 to 2010. So they didn't go near an argument that that statement of statistical significance was false because their own witness said that it was valid, and they, in their brief, state that there's nothing wrong with doing a P value on secondary or tertiary endpoints. And contrary to what they say, and you can look at the law that I referred to in terms of Congress' 2012 act, mortality is always relevant, and you will see that the FDA, by federal statute now, is to look at all kinds of evidence, but by federal statute, and they've got it cited to the court, that never mentions P values, it never mentions statistical significance, and it allows the FDA to initiate an expedited review and approval based on other forms of evidence without ever suggesting that it's required to consider, much less be controlled by, P values and statistical significance. Thank you very much. Thank you, counsel. U.S. nurses, your code is submitted.
judges: Kleinfeld, Wardlaw, Morris